UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCHOENMANN,<br><br>          Appellant,<br><br>    v.<br><br>SCHOENMANN et al.,<br><br>          Appellees. | Case No. 22-cv-09156-AMO<br><br>**ORDER RE BANKRUPTCY APPEAL** |

Before the Court is Appellant Lynn Schoenmann's appeal of the Bankruptcy Court's grant of summary judgment in favor of Stuart Gordon Schoenmann.[1] Lynn generally challenges the claim preclusive effect of a state court order in the bankruptcy proceedings. The Court finds the matter to be appropriate for disposition without oral argument. *See* Civ. L.R. 7-1(b). For the reasons discussed below, the Court **AFFIRMS** the bankruptcy court.

I.   **BACKGROUND**

Appellant Lynn Schoenmann is the debtor in Bankruptcy Case No: 22-30028 and surviving wife of Donn Schoenmann. Appeal Appendix, Vol. 1 at 261.[2] Appellees are three of Donn's children from his first marriage (Stuart, Celeste, and Beth), and the surviving daughter (Colette) of Donn's fourth child from that marriage who predeceased Donn. 1-AA-261, 324-328. Stuart is the executor of Donn's estate. 1-AA-261.

---

[1] In light of the litigants' shared last name, the Court follows the course set in their papers and mostly refers to the parties using "the respectful, shorthand first-name formulaic of family law" to mitigate confusion. Appellant's Opening Br. at 3 (ECF 10 at 8).

[2] Further citations to the appendix will use the volume-AA-page format pursuant to Circuit Rule 30-1.6.

The Court provides a brief overview of the pertinent proceedings relating to the underlying bankruptcy action and will then expand on the disputed decisions made by the bankruptcy court leading up to the order that Lynn appeals.  In this Order, the Court cites to facts from the appendices filed by Lynn in this action and the parties' briefing.  *See generally* Appendices 1, 2, 3 (ECF 11, ECF 12, ECF 13).

### A.   The Four Properties and the Deeds in Issue

Lynn and Donn Schoenmann were married on May 1, 1993.  1-AA-17.  During their marriage, Donn and Lynn acquired the real properties at issue here: (1) a home in San Francisco, at 920 Powell Street, (2) a home in Mill Valley, California, at 39 Ethel Street; (3) a vacation property in Idyllwild, California, consisting of two adjacent parcels, one improved with a home, the other unimproved; and (4) a condominium in Scottsdale, Arizona (collectively "the Real Property").  1-AA-233.  Three sets of deeds executed in 2016, including deeds executed in March, July, and November of that year, gave rise to the litigation underlying this appeal.

#### 1.   The March Deeds

The probate court found, "When away from Lynn, Donn was able to articulate his desired estate plans which specifically excluded Lynn."  1-AA-241.  "In April 2015, Donn retained probate and estate lawyer Alicia Gamez (Gamez).  Donn directed Gamez to revoke his family trust and to revoke the right of survivorship designations in all of the marital real property.  Donn stated that he did not want Lynn to receive (or to be in control of) any of his assets upon his death."  1-AA-235.  Gamez met with Donn alone on January 22, 2016, and Donn again told Gamez that he wished to revoke Lynn's right of survivorship.  2-AA-523-24; 2-AA-687.

In March 2016, Donn executed the new estate planning documents prepared by Gamez, including modifications to the grant deeds that severed Lynn's right of survivorship in the real property.  1-AA-236; 2-AA-689-706.  These documents were prepared to "effectuate" Donn's "desire" that "all of his assets [] be divided equally among his six (6) children" and "that he wanted Lynn to receive nothing."  1-AA-252:11-16.

//

//

### 2.     The July Deeds

"In May 2016, Lynn discovered that Donn terminated the right of survivorship designations on the grant deeds to the marital real properties. This upset Lynn greatly, and as Donn predicted, a campaign to unwind the deed designations ensued." 1-AA-236. Ultimately, "in June 2016, Lynn initiated divorce proceedings." 1-AA-237.

Donn "hired family law specialist Cheryl Sena (Sena) to represent him in the new dissolution proceedings." 1-AA-237. "On July 15, 2016, Sena (on behalf of Donn) began to negotiate the terms of a dissolution or, alternatively, a [post-marital agreement ("PMA")], with Lynn, who was representing herself in pro per." 1-AA-237.

Lynn "acknowledged that Donn was in dire financial straits and proposed to pay Donn [at least] $150,000 in exchange for a new executed deed to [39 Ethel] titled as joint tenants with right of survivorship." 1-AA-237. "Donn rejected this offer." 1-AA-237; 2-AA-542.

"On July 27th, after Donn rejected Lynn's proposal, Lynn took a trip to Idyllwild to visit Donn. Lynn described Donn as emaciated, weak, disoriented and abusing drugs. Nonetheless, Lynn walked with Donn to a coffee shop in [Idyllwild]. When they arrived, they were greeted by a notary who was waiting for them with a prepared grant deed for the Mill Valley property changing title to joint tenants with right of survivorship. Despite Donn's July 15th rejection of [Lynn's] offer, which would have included a payment of $150,000-$200,000, Donn now executed this deed for no consideration." 1-AA-237-38.[3]

"The next day, on July 28, 2016, Donn was located (by Lynn and [their son Jason]) in the kitchen at 4:00 a.m. naked and disoriented. Lynn, frustrated, took all of Donn's prescription medications to 'wean him off of them.' " 1-AA-238. "On July 29, 2016 Donn was again in the kitchen naked and disoriented in the early morning hours. This time he was taken by ambulance to the hospital. Donn returned from the hospital at approximately noon. After returning from the hospital, Lynn again walked with Donn to a coffee shop in [Idyllwild]. When they arrived, they

---

[3] The probate court noted, "When with Lynn, Donn appeared to be unable to maintain his position(s) and acceded to her demands. (Including demands that he had previously rejected when not in her presence.)" 1-AA-241.

were greeted by the same notary who was now waiting for them with prepared grant deeds for the [Idyllwild] and Powell Street properties changing title to joint tenants with right of survivorship. Donn executed these deeds for no consideration." 1-AA-238.

The July Deeds were all signed on either July 27 or July 29, 2016. 2-AA-744-46; 2-AA-748-50. During those days, "Donn was abusing narcotics and appeared emaciated, weak, disoriented and 'out of it.' " 1-AA-249. Indeed, these deeds "were executed in secret and at a time when Donn was alone, had just been released from the hospital, and was described as 'disoriented.' " 1-AA-253.

"On August 1, 2016, Donn told Gamez that he was in Idyllwild with Lynn and the kids. Donn stated that Lynn was demanding that he change his estate plans. He stated that Lynn was enraged and berating him and he felt vulnerable to Lynn's pressure. Donn told Gamez that Lynn was screaming at him and throwing things. Gamez told Donn to call the police. Gamez described Donn as emotionally drained. Donn complained that Lynn was able to control where Donn lived, whether he had money and whether he had access to the kids. Donn stated that he was under a tremendous amount of pressure." 1-AA-238. Donn would later say "that in one of his 'less lucid moments' he signed the Mill Valley home to Lynn. He stated Lynn brought him to a coffee shop, that a notary was waiting and that the document(s) had been pre-prepared. He stated that he had no idea if the executed documents distributed the property directly to Lynn or if it was held in joint tenancy." 1-AA-239; 2-AA-752.

### 3. The Post-Marriage Agreement and November Deeds

"On November 1, 2016, Lynn permitted Donn to move back to the Mill Valley home. Lynn told Sena that she wanted the PMA signed as soon as possible, noting upcoming doctor appointments for Donn. The medical notes described Donn as thin and frail and that he felt sad and hopeless." 1-AA-239. Lynn was also "grumpy" with Donn's attempts to take time considering the agreement. 2-AA-565-66. Ultimately, "Donn was tired. He had suffered years of abuse from Lynn and he was extraordinarily vulnerable to her demands and cruelty. At the end of 2016, Donn was dying, and he was afraid that he may die alone in Idyllwild where he felt abandoned and isolated. As such, he was desperate to find a way to live the rest of his life in the

4

Mill Valley family home. The PMA was his only option and as such, he agreed to the terms." 1-AA-255.

"On November 8, 2016: Sena provided Lynn and Donn with a copy of the proposed final PMA. Sena advised Donn not to sign it because the PMA gave the lion's share of the assets to Lynn. Nonetheless, both Donn and Lynn signed the PMA on November 9, 2016." 1-AA-239. The PMA itself provides that "[t]he real property locations in Mill Valley, Idyllwild, and Scottsdale will all be held as community property with right of survivorship." 1-AA-240; 3-AA-798-99 § 2(a). It also provided that "concurrent with the execution of this agreement" the Parties "agree to execute conforming deeds, if necessary." *Id.* The November Deeds were signed and notarized in conformance with these provisions at the same time the PMA was signed. 2-AA-564.

There appears to be no dispute that, following execution of the PMA and the associated November Deeds, Donn and Lynn lived together with their two teenage children until Donn died on March 22, 2018. *See* 1-AA-294.

### B. The California Probate Court Trial

Later in 2018, four of Donn Schoenmann's heirs (Appellees) brought a state probate court action against Lynn challenging the PMA and related real property deeds that purported to give Lynn rights of survivorship in the four real properties, thereby transferring most of Donn's assets at death to Lynn. 1-AA-259-328.

The parties stipulated to bifurcate trial in the probate action, and the legal claim presented at the first trial phase was "[w]hether the Post Marital Agreement dated November 9, 2016, is a binding enforceable agreement under the Family Code and other provisions of law, as more particularly addressed in *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712 and related cases." 1-AA-368-371. Trial commenced on November 2, 2021, and took 10 court days, ending on November 24, 2021. 1-AA-232:1-10; 1-AA-227 ¶ 7. Trial implicated a wide range of disputed factual issues, including presentation and litigation of years of background and months of relevant conduct. *See, e.g.*, the parties' issue conference statements before trial (2-AA-373-395, 2-AA-399-428), opening statements (2-AA-455-514), and closing arguments (2-AA-581-684).

Following the trial, on December 27, 2021, the probate court issued a "Tentative Decision" determining that the PMA was "the product of undue influence [on Lynn's part] and as a result is invalid." 1-AA-118. In the Tentative Decision, the court made several findings of fact, including the following:

- "Donn and Lynn Schoenmann were married from 1993 until Donn's death in 2018." 1-AA-96. "In 1994, Donn was diagnosed with cancer and became seriously ill. This illness (and subsequent courses of treatment) significantly impacted Donn's health and altered the course of Donn's and Lynn's life. Donn's health deteriorated progressively and the state of his health was a constant concern." *Id.*

- By 2016, Donn "was physically frail and had already outlived his life expectancy by many years. He was often sick, fragile, unwell, addicted to pain medications and in and out of hospitals and Doctors' offices. Absent an unusual and unforeseen event, it was clear to everyone that Donn would predecease Lynn." 1-AA-107-08.

- By July 2016, "Donn was tired. He had suffered years of abuse from Lynn and he was extraordinarily vulnerable to her demands and cruelty." 1-AA-118. Therefore, as Lynn's medical expert admitted, Lynn was able to go around Donn's advisors to get what she wanted and influence Donn "especially if Lynn isolated Donn from his advisors." 1-AA-111.

- The state court thus concluded that Donn was vulnerable because "[h]e was 77 years old, he had been physically ill for many years, he was addicted to opiates, he was living alone and isolated from his children, he had dwindling financial resources and was married to (and dependent upon) a woman who disliked him." 1-AA-110.

- The state court found that "For most of their marriage, both Donn and Lynn believed that Lynn had authority over Donn." 1-AA-111-13 (citing 11 examples from 2012 to 2017). Lynn achieved this through a wide range of conduct, the court found, including that (1) "Lynn unnecessarily controlled Donn's access to the marital assets as well as his ability to interact with his children" (1-AA-113); (2) "Lynn interfered with Donn's relationships with his legal advisors" (1-AA-113); (3) "Lynn used intimidation to influence Donn" (1-

6

AA-113); (4) "Lynn used the false hope of reconciliation to achieve her desired results from Donn" (1-AA-114); and (5) "when Donn was alone with Lynn, and confronted by her, he was at times, unable to maintain his stated position(s). The evidence also established that Lynn used this frailty and vulnerability to her advantage by secretly encouraging Donn to execute documents that were clearly against his interests and when he was isolated from legal and familial support." 1-AA-115.

- The state court further found that Lynn "affirmatively and intentionally misrepresented the values of both [39 Ethel] as well as her [retirement] account" during negotiations. 1-AA-117. Because of this, "Donn did not have full knowledge of all of the facts at the time he executed the PMA." 1-AA-118.

- "The PMA significantly financially favored Lynn to Donn's detriment." 1-AA-242:7. Specifically, "as a result of the execution of the PMA, at the time of Donn's death, Donn's estate received 23% of the couple's net assets and Lynn received 77%." 1-AA-106-07. It "unfairly advantaged Lynn over Donn." 1-AA-109. Those ratios include Lynn's receipt of over $2 million more in real property than Donn due to the survivorship deeds. 1-AA-107.

The probate court concluded, "based upon all of the evidence, that the PMA signed by Donn and Lynn Schoenmann on November 8, 2016 was the product of undue influence and as a result is invalid." 1-AA-118.

### C. The Bankruptcy Proceedings

Approximately three weeks later, Lynn Schoenmann filed her voluntary bankruptcy petition on January 13, 2022, automatically staying further proceedings in the probate court. *In re E. Lynn Schoenmann*, No. 22-30028 (N.D. Cal. Bankr. Ct.). Relevant here, these parties filed two adversary actions against each other in the context of the bankruptcy case. Stuart and the others initiated an adversary proceeding against Lynn on April 8, 2022, seeking a determination of the nondischargability of debts. *Schoenmann et al. v. Schoenmann*, No. 22-3019 (N.D. Cal. Bankr. Ct.) (the "Nondischargability Action"). Lynn then initiated an adversary proceeding against Stuart, Beth, Celeste, and Colette on May 16, 2022, seeking quiet title to the real property.

7

*Schoenmann v. Schoenmann et al.*, No. 22-3024 (N.D. Cal. Bankr. Ct.) (the "Quiet Title Action"). The instant appeal arises from the Quiet Title Action.

In the Nondischargability Action, the parties stipulated, "The Tentative Decision shall be deemed a final adjudication for purposes of issue or claim preclusion. The term 'necessarily decided' with respect to matters in the Tentative Decision is to have the same meaning used in evaluating the preclusive effect of a final judgment under California law." *Schoenmann*, No. 22-3019 (Bankr. ECF 22). Relying on this stipulation and the findings of fact from the Tentative Decision, Stuart moved for summary judgment. *Schoenmann*, No. 22-3019 (Bankr. ECF 25). The bankruptcy court denied summary judgment in part because, even accepting the preclusive effect of the Tentative Decision, Stuart failed to establish all the elements of the claim for nondischargability. *Schoenmann*, No. 22-3019 (Bankr. ECF 48).

The parties did not similarly stipulate to the preclusive effect of the Tentative Decision in the Quiet Title Action. Stuart moved for summary judgment. *Schoenmann*, No. 22-3024 (Bankr. ECF 9). The bankruptcy court again accepted the preclusive effect of the Tentative Decision and granted summary judgment. *Schoenmann*, No. 22-3024 (Bankr. ECF 21). Relying on the Tentative Decision, the court concluded that (1) the November deeds, executed simultaneously with the PMA, were invalid; (2) the July deeds were similarly invalid based on the same record; and (3) the March deeds were valid in light of a lack of evidence contesting their validity. *Id.* Lynn appeals the bankruptcy court's grant of summary judgment.

## II.     STANDARD OF REVIEW

District courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" of the bankruptcy courts. 28 U.S.C. § 158(a)(1); *see also* Fed. R. Bankr. Proc. 8005. A district court reviews a bankruptcy court's findings of fact for clear error and conclusions of law de novo. *See In re Mortg. Store, Inc.*, 773 F.3d 990, 994 (9th Cir. 2014) (citing *In re Lazar*, 83 F.3d 306, 308 (9th Cir. 1996)). Immensely case-specific factual issues require deference by the district court to the bankruptcy court. *U.S. Bank N.A. v. The Village at Lakeridge, LLC*, 583 U.S. 387, 396 (2018).

8

## III. DISCUSSION

Lynn brings this appeal challenging the bankruptcy court's grant of summary judgment regarding the validity of the November deeds, the July deeds, and the March deeds. Lynn argues that the Tentative Decision should not be given preclusive effect in the Quiet Title Action. The Court begins its analysis with the bankruptcy court's issue preclusion conclusions regarding the invalidity of the November deeds and the July deeds because the issue preclusion analysis influences the remainder of the discussion. The Court then turns to address Lynn's argument that the bankruptcy court should not have determined that the November deeds constituted part of the same transaction as the PMA such that they should rise and fall together. Finally, the Court addresses Lynn's challenge to the bankruptcy court's conclusion regarding the validity of the March deeds.

### A. Issue Preclusion

State judicial proceedings receive the same full faith and credit in every federal court as they would have in the courts of the state in which the matter originated. 28 U.S.C. § 1738. Section 1738 "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (Section 1738 "requires a federal court to look first to state preclusion law in determining the preclusive effects of a state court judgment").

In California law, the doctrine of collateral estoppel, or issue preclusion,

> bars relitigation of issues earlier decided only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*People v. Strong*, 13 Cal. 5th 698, 715, 716 (2002) (internal quotation marks omitted); *see also Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (1990). "The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether

9

1　the ultimate issues or dispositions are the same." *Lucido*, 51 Cal. 3d at 341.  For a matter to be

2　considered "necessarily decided," "courts have previously required only that the issue not have

3　been 'entirely unnecessary' to the judgment in the initial proceeding." *Id.* (citations omitted).

4　　　　Whether issue preclusion applies is a mixed question of law and fact that is reviewed either

5　for clear error or de novo, depending on an appellate court's assessment of whether issues of fact

6　or of law predominate.  *U.S. Bank Nat'l Ass'n v. Village at Lakeridge*, 583 U.S. 387, 396 (2018);

7　*Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 (9th Cir. 1988).  Once the court determines that

8　issue preclusion is available to be applied as a matter of law, then the determination whether to

9　apply it under the facts falls within the discretion of the bankruptcy judge, whose decision in that

10　respect will be reviewed for abuse of discretion.  *Robi*, 838 F.2d at 321.

11　　　　In this appeal, Lynn challenges the preclusive effect of the probate court's Tentative

12　Decision in the bankruptcy court's grant of summary judgment in the Quiet Title Action.  The

13　parties do not dispute that the litigants are the same in both the probate action and the bankruptcy

14　adversary proceedings.  The Court thus discusses in turn the remaining four elements: (1) identical

15　issues, (2) actually litigated, (3) necessarily decided, and (4) final judgment.  *See Lucido*, 51 Cal.

16　3d at 341.

### 　　　　1.　　Identical Issues

18　　　　Lynn argues in part that the Tentative Decision should not be given issue preclusive effect

19　because it dealt with a different issue than the issue presented in the Quiet Title Action.  *See*

20　Appellant's Opening Br. at 23 (ECF 10 at 28).  Lynn contends that the issue tried before the

21　probate court was limited by stipulation to the validity of the PMA, not the validity of either the

22　July deeds or the November deeds.  *See id.* at 23.  Lynn poses a distinction between the legal issue

23　addressed in the probate trial (whether the PMA was invalid as a result of Lynn's undue influence)

24　and the legal issue addressed in the Quiet Title Action (whether the July deeds and November

25　deeds were invalid as a result of Lynn's undue influence), leaving unidentical issues presented and

26　preventing the application of issue preclusion.  *Id.* at 24-25 (ECF 10 at 29-30).  This

27　misapprehends the identical issue requirement for issue preclusion, which "addresses whether

10

identical factual allegations are at stake, 'not whether the ultimate issues or dispositions are the same.' " *Key v. Tyler*, 34 Cal. App. 5th 505, 534 (2019) (quoting *Lucido*, 51 Cal. 3d at 342).

At issue in the probate court trial was whether the PMA was invalid based on undue influence exerted by Lynn. *See* 1-AA-368-371. Undue influence is "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." Cal. Welf. & Inst. Code § 15610.70(a); *Levin v. Winston-Levin*, 39 Cal. App. 5th 1025, 1042 (2019). Evaluating a claim of undue influence involves factual issues such as the vulnerability of the victim, the influencer's apparent authority, the actions or tactics used by the influencer, and the equity of the result. Cal. Welf. & Inst. Code § 15610.70(a). "[D]irect evidence of undue influence is rarely obtainable and, thus the court is normally relegated to determination by inference from the totality of facts and circumstances. Indeed, there are no fixed definitions or inflexible formulas. Rather, we are concerned with whether from the entire context it appears that one's will was overborne and he was induced to do or forbear to do an act which he would not do, or would do, if left to act freely." *Keithley v. Civil Serv. Bd.*, 11 Cal. App. 3d 443, 451 (1970) (citations omitted).

Although the probate court reached no conclusion regarding the validity of the deeds, it examined the totality of the circumstances and held that the PMA was the result of Lynn's undue influence as exhibited through several years of Lynn's conduct towards Donn. 1-AA-111-13 (detailing Lynn's exercise of apparent authority over Donn). Lynn's conduct obtaining the PMA was the same course for securing the July Deeds and November Deeds. Thus, the identical issue was presented to the probate court.

### 2. Actually Litigated

Lynn argues that the validity of the November and July deeds, or the invalidity of Donn's will and related documents, was not actually litigated in the probate proceeding. In so arguing, Lynn emphasizes the narrow focus of the trial – the validity of the PMA – as a result of the stipulated bifurcation of the probate proceedings. *See* 1-AA-368-71 (describing the legal claim presented at the first phase of trial as "[w]hether the Post Marital Agreement dated November 9, 2016, is a binding enforceable agreement under the Family Code and other provisions of law, as

1   more particularly addressed in *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712 and related
2   cases."). But Lynn's argument misapprehends the scope of the probate court's validity assessment
3   and the related undue influence inquiry.
4       "An issue is actually litigated when it is properly raised, by the pleadings or otherwise, and
5   is submitted for determination, and is determined." *Ayala v. Dawson*, 13 Cal. App. 5th 1319,
6   1330, (2017) (cleaned up). "In considering whether these criteria have been met, courts look
7   carefully at the entire record from the prior proceeding, including the pleadings, the evidence, the
8   jury instructions, and any special jury findings or verdicts." *Hernandez v. City of Pomona*, 46 Cal.
9   4th 501, 511 (2009).
10      A seminal California appellate case defined undue influence as follows:

> [u]ndue influence . . . is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment. The hallmarks of such persuasion is high pressure, a pressure which works on mental, moral, or emotional weakness to such an extent that it approaches the boundaries of coercion. In this sense, undue influence has been called overpersuasion.

*Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 130 (1966). The *Odorizzi* court listed seven factors which "generally accompany" overpersuasion:

> (1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party, (7) statements that there is no time to consult financial advisers or attorneys. If a number of these elements are simultaneously present, the persuasion may be characterized as excessive.

*Id.* at 133. As detailed more fully in the preceding section, this list is not exhaustive, "there are no fixed definitions or inflexible formulas," and determination of undue influence is normally based on "inference from the totality of facts and circumstances." *Keithley*, 11 Cal. App. 3d at 451. Where undue influence is established, a resulting contract is unenforceable because "[a]n apparent consent is not real or free when obtained through . . . [u]ndue influence." Cal. Civ. Code § 1567; *see* Cal. Civ. Code § 1550 ("It is essential to the existence of a contract that there should be . . .

12

consent"). The rule applies with equal force to deeds, as undue influence cases "have usually involved elderly, sick, senile persons alleged to have executed wills or deeds under pressure." *Odorizzi*, 246 Cal. App. 2d at 131. Thus, where a deed is obtained by undue influence, it will be disregarded. *See, e.g.*, *In re Marriage of Fossum*, 192 Cal. App. 4th 336, 346 (2011).

Here, the probate court's assessment of Lynn's undue influence over Donn required a review of the totality of circumstances. Though the first phase of the bifurcated trial ostensibly focused narrowly on the validity of the PMA, it required a broad scope of inquiry to assess whether, based on the totality of circumstances, Lynn exerted undue influence over Donn in the negotiation and execution of the PMA. The parties' issue conference statements before trial (2-AA-373-395, 2-AA-399-428), opening statements (2-AA-455-514), and closing arguments (2-AA-581-684) all reflect the broad factual issues – including years of background and months of relevant conduct leading up to the PMA – actually presented and litigated at the trial. Over the course of the 10-day trial, the parties made a robust factual record related to Lynn's conduct in the years and months preceding execution of the PMA, which led the probate court to conclude that the PMA was obtained through undue influence. 1-AA-109-16. The bankruptcy court considered that finding of undue influence in holding that the July and November deeds were similarly invalid. *Schoenmann*, 22-3024 (Bankr. ECF 21) at 3-5. There is no doubt that the facts regarding Lynn's exercise of undue influence over Donn, particularly in the months preceding execution of the PMA, were actually litigated in the probate trial.

### 3. Necessarily Decided

Lynn avers that the validity of the November and July deeds was not necessarily decided by the probate court. *See* Appellant's Opening Br. at 25. Under California law, an issue is necessarily decided when (1) there are explicit findings of an issue made in a judgment or decision, or (2) or when the issue is a conclusion that must have been necessarily decided by the court. *Samuels v. CMW Joint Venture* (*In re Samuels*), 273 F. App'x 691, 693 (9th Cir. 2008). "Whether an issue was 'necessarily decided' has been interpreted to mean that the issue was not 'entirely unnecessary' to the judgment in the prior proceeding." *Lucido*, 51 Cal.3d at 342. California courts interpret this standard broadly, recognizing that "findings that were important to

the court's decision may be binding even if they were not themselves dispositive of an ultimate legal issue." *Key*, 34 Cal. App. 5th at 534-35. "Factual findings can support a decision on the merits of a claim even if they do not themselves resolve an element of the claim." *Id.* at 536 (citing *Ayala v. Dawson*, 13 Cal. App. 5th 1319, 1331 (2017)).

Lynn argues that the probate court erred by looking at a range of conduct outside of and beyond Donn's state of mind on November 9, 2016. One of the probate court's tasks during the trial was to assess whether Lynn established that the PMA was not the result of undue influence, an assessment that required reviewing (1) "the vulnerability of the victim," (2) "the influencer's apparent authority," (3) "the actions or tactics used by the influencer," and (4) "the equity of the result." 1-AA-110 (citing Cal. Welf. & Ins. Code § 15610.70(a)). Relevant to both the PMA and the execution of the deeds, a contract resulting from undue influence is unenforceable because "[a]n apparent consent is not real or free when obtained through . . . [u]ndue influence." Cal. Civ. Code § 1567.

In the Quiet Title Action, Stuart moved for summary judgment on the issues of undue influence and unclean hands. *See* 1-AA-193-225. The probate court found that, among other conduct, Lynn used the following tactics to influence Donn in the years preceding execution of the July and November deeds: (1) "Lynn unnecessarily controlled Donn's access to the marital assets as well as his ability to interact with his children" (1-AA-113); (2) "Lynn interfered with Donn's relationships with his legal advisors" (*id.*); (3) "Lynn used intimidation to influence Donn" (*id.*); (4) "Lynn used the false hope of reconciliation to achieve her desired results from Donn" (1-AA-114); and (5) "when Donn was alone with Lynn, and confronted by her, he was at times, unable to maintain his stated position(s). The evidence also established that Lynn used his frailty and vulnerability to her advantage by secretly encouraging Donn to execute documents that were clearly against his interests and when he was isolated from legal and familial support" (1-AA-115). The probate court, in making its totality of the circumstances assessment, considered Donn's history with Lynn, including Lynn's conduct in the preceding year, including, up to, and through the execution of both the July and November deeds. *See* 1-AA-113-16. The probate court made factual findings regarding Lynn's conduct related to the July and November deeds, and

14

while it did not reach the legal conclusion of the validity of those sets of deeds, those findings were important to the conclusion that the PMA resulted from undue influence. *Id.* Lynn's conduct in Idyllwild in July 2016, for example, was necessary to the outcome of the Tentative Decision where it informed the Court's understanding of how Lynn wielded influence over Donn. 1-AA-116. The probate court's findings accordingly were not "entirely unnecessary," and these issues thus satisfy the "necessarily satisfied" element in support of issue preclusion. *Lucido*, 51 Cal. 3d at 342. Lynn's "disputes with the soundness of [the state court's] reasoning are not a basis for concluding [those] findings were 'unnecessary' or not issue-preclusive." *Meridian Fin. Servs., Inc. v. Phan*, 67 Cal. App. 5th 657, 701-02 (2021). The factual issues reached by the probate court were necessarily decided for purposes of issue preclusion.

### 4. Final Judgment

Lynn argues for the first time on appeal that the state court did not reach a final decision. Appellant's Opening Brief at 32-37. Lynn failed to argue before the bankruptcy court that the Tentative Decision's lack of finality prevented the application of issue preclusion. Indeed, Lynn acknowledged and argued the other three elements, but she did not resist the application of issue preclusion on the lack of finality in the probate court's Tentative Decision.[4] *See* 3-AA-896-99 (Lynn's brief in opposition to Appellees' motion for summary judgment). Courts have long made clear, however, that "[a] party normally may not press an argument on appeal that it failed to raise in the district court." *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009). "This rule serves to ensure that legal arguments are considered with the benefit of a fully developed factual record, offers appellate courts the benefit of the district court's prior analysis, and prevents parties from sandbagging their opponents with new arguments on appeal." *Dream Palace v. Cty. of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004).

Though there are exceptions to that rule, *see Raich v. Gonzales*, 500 F.3d 850, 868 (9th Cir. 2007) (enumerating three circumstances in which courts may exercise discretion to hear new

---

[4] Lynn's omission of argument regarding the Tentative Decision's lack of finality is entirely consistent with the record, including hearing transcripts, in which Lynn's counsel made clear that the result of the Tentative Decision would be accepted as final for purposes of the bankruptcy proceeding. *See id.*; *see also* 3-AA-841-43.

15

argument on appeal), Lynn fails to identify any exception that permits the Court to consider an argument raised for the first time on appeal.  For these reasons, the Court declines to consider Lynns' new argument that the Tentative Decision lacks finality for issue preclusive purposes.

* * *

In sum, the Court finds no error in the bankruptcy court's issue preclusion analysis and AFFIRMS.

### B. The November Deeds as Part of the Same Transaction as the PMA

The bankruptcy court held that the November deeds were part of the same transaction as the PMA and were accordingly invalid in light of the probate court's invalidation of the PMA. Lynn argues that the bankruptcy court reached this conclusion in error because the November deeds are not necessarily part of the same transaction as the PMA.  Lynn challenges that the PMA and November deeds are not sufficiently linked to warrant construing them together.  Appellant's Opening Br. at 26-27 (citing *Coons v. Henry*, 186 Cal. App. 2d 512, 517 (1960) ("only when upon their face they deal with the same subject matter and are by reference to one another so connected that they may be fairly said to be interdependent." (internal quotation marks omitted)).

In California, "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."  Cal. Civ. Code § 1642.  Considering contracts together is particularly appropriate where the documents refer to each other, *Series AGI W. Linn of Appian Grp. Inv'rs DE, LLC v. Eves*, 217 Cal. App. 4th 156, 162 (2013), or where the contracts are signed contemporaneously, *Reigelsperger v. Siller*, 40 Cal. 4th 574, 580 (2007).

The PMA and the deeds relate to the same real property such that they are interdependent. Donn executed the November deeds for the express purpose of conforming title to the PMA.  3-AA-797-803; 1-AA-24-39.  The PMA provides under the header "Confirmation of Property" that each of the parcels of real property is "currently held as joint tenants with rights of survivorship. Parties intend to hold said property as 'community property with rights of survivorship', and concurrent with the execution of this agreement, agree to execute a conforming deed, if necessary." 3-AA-797-98.  Based on the PMA's express reference to execution of conforming

16

1  deeds and the undisputed fact that Donn executed the November deeds concurrent with the PMA,

2  the bankruptcy court concluded that the November deeds and the PMA were part of a single

3  transaction. *Schoenmann*, No. 22-3024 (Bankr. ECF 21) at 4. Lynn argues that the PMA

4  addressed subjects beyond the confirmation of real property such that the deeds do not meet the

5  stringent requirements for multiple contracts to be treated as one, but this does not alter the

6  November deeds' interdependence with the PMA where the PMA expressly refers to the

7  conforming deeds. 3-AA-797-803; 1-AA-24-39. Lynn fails to present any authority for the

8  premise that, in the case of two contracts executed together, one contract's discussion of additional

9  issues precludes finding that a second contract, expressly referred to by the first contract, should

10  not be construed together. Therefore, the Court AFFIRMS the bankruptcy court's conclusion that

11  the November deeds were invalid because they were part of the same transaction as the PMA.

### C. The Bankruptcy Court's Conclusion Regarding the March Deeds

Finally, Lynn argues that the bankruptcy court improperly found that there existed no dispute of material facts regarding the validity of the March deeds. The bankruptcy court stated in relevant part,

> As to the March Deeds, while they were not dealt with specifically by the Tentative Decision, the Defendants have established that there are no material facts in dispute based upon the current record that would require denial of the MSJ as to them; rather, Defendants have established and Plaintiff has not rebutted, the validity of those March Deeds as reflecting Donn Schoenmann's intent.

*Schoenmann*, 22-3024 (Bankr. ECF 21) at 2.

Lynn argues that Donn was impaired on an occasion two days after the March deeds were signed, and the bankruptcy court should have "given some credit" to those "facts." Appellant's Opening Brief at 40 (ECF 10 at 45). In support of the validity of the March deeds, Stuart relied on the probate court's finding that Donn's March will properly reflected his intent and that the March will was prepared and executed in private consultation with Donn's own counsel, in service of his own desired estate plan. 1-AA-252. Donn signed his final will and the March deeds were signed at the same meeting in Gamez's offices and were thus part of the same transaction for the reasons stated above, Section III.B. *See also* 2-AA-532-34. These testamentary documents implemented

17

Donn's desire for his assets "to be divided equally among his six (6) children" and for Lynn to "receive nothing." 1-AA-252.

In her brief opposing Stuart's motion for summary judgment in the Quiet Title Action, Lynn argued that the March deeds are invalid because they resulted from Stuart's undue influence. Lynn, however, failed to present any evidence regarding Stuart's apparent authority or any other evidence in support of her claim of invalidity. *See* 3-AA-908-10; *see also* Section III.A.3, above (discussing undue influence). Lynn argues on appeal that she did, in fact, present evidence that contradicted the validity of the March deeds in the form of her interrogatory responses. *See* Appellant's Opening Br. at 40-41 (citing 3-AA-1072). Lynn provides block-quote excerpts from her interrogatory responses (*id.*), but she does not identify which part of her responses contradicts the probate court's findings and she does not identify how such facts are material to the analysis. The Court declines to hunt for discrepancies in the record to identify a genuine dispute of material fact. *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (the district court has no responsibility on summary judgment to "scour the record in search of a genuine issue of triable fact"); *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("[J]udges are not like pigs, hunting for truffles buried in briefs"). This Court concurs with the bankruptcy court – Lynn fails to present evidence that would create a genuine dispute of material fact regarding the validity of the March deeds.

In a final flourish, Lynn asserts that she was not given an opportunity to conduct discovery on the March deeds. Appellant's Opening Br. at 41. Where a party needs additional discovery to properly oppose summary judgment, the proper procedure to seek such relief is provided by Federal Rule of Civil Procedure 56(d).[5] Lynn did not move for discovery under Rule 56(d). Indeed, she did not argue at the bankruptcy court that she required further discovery related to the March deeds; rather, she admitted that "the parties conducted extensive discovery" in the probate proceeding. 3-AA-884. Lynn's failure to seek further discovery under Rule 56(d) bars her from

---

[5] "Federal Rule of Civil Procedure 56(d) was, until December 1, 2010, codified as Federal Rule of Civil Procedure 56(f)." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 676 (9th Cir. 2018).

complaining on appeal that she was not given discovery.  *See Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986).

Ultimately, Lynn fails to show any error in the bankruptcy court's grant of summary judgment to Stuart regarding the validity of the March deeds.  The Court affirms the decision.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby **AFFIRMS** the bankruptcy court's memorandum decision and order regarding summary judgment.

**IT IS SO ORDERED.**

Dated: September 17, 2024

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**